# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

|  |  |
|---|---|
| SHAINA SILVERMAN and TYLER KIMBROUGH, individually and on behalf of themselves and all others similarly situated, | No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| REALPAGE, INC.; BROOKFIELD RESIDENTIAL PROPERTIES LLC; CUSHMAN & WAKEFIELD, INC.; EQUITY RESIDENTIAL; GREYSTAR REAL ESTATE PARTNERS, LLC; AVALONBAY COMMUNITIES, INC.; TF CORNERSTONE, INC.; and ROSE ASSOCIATES INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |



**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................ 1

II.   JURISDICTION AND VENUE ...................................................... 3

III.  PARTIES ........................................................................................ 4

    A.    Plaintiffs Silverman and Kimbrough .................................. 4

        1.    Plaintiff Shaina Silverman .................................... 4

        2.    Plaintiff Tyler Kimbrough .................................... 4

    B.    Defendant RealPage and the Lessor Defendants .................. 5

        1.    Defendant RealPage, Inc. ...................................... 5

        2.    Defendant Brookfield Residential Properties LLC ... 5

        3.    Defendant Cushman & Wakefield, Inc. .................. 5

        4.    Defendant Equity Residential ................................ 5

        5.    Defendant Greystar Real Estate Partners, LLC ...... 5

        6.    Defendant AvalonBay Communities, Inc. .............. 6

        7.    Defendant TF Cornerstone, Inc. ............................ 6

        8.    Defendant Rose Associates, Inc. ........................... 6

        9.    Unnamed Co-conspirators ..................................... 7

IV.   FACTUAL ALLEGATIONS ............................................................ 7

    A.    The Relevant Market Responds to Supply and Demand Fundamentals in the Normal Course ................................... 7

    B.    Defendant's Businesses ....................................................... 8

    C.    Before RealPage, Lessors Set Prices Independently ........... 10

    D.    The Lessor Defendants Eliminate Competition by Outsourcing Price and Supply Decisions to a Common Decisionmaker, RealPage ........................ 10

    E.    The Lessor Defendants Have Inflated Prices, Reduced Occupancy (i.e. Output) and Have Distorted the Market for Residential Real Estate Leases ........................ 12

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

F.     Plus Factors Indicate the Market for Multifamily Residential Real Estate Leases in the Geographic Areas is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel ................................................ 13

G.     Defendants Violate FTC Guidelines ........................................................ 16

H.     Defendants' Conduct Has Drawn Scrutiny .............................................. 16

I.     Defendants' Conduct Has Caused Antitrust Injuries ............................... 17

V.    CLASS ALLEGATIONS ..................................................................................... 17

VI.    CAUSES OF ACTION ....................................................................................... 19

FIRST CAUSE OF ACTION  VIOLATION OF THE SHERMAN ACT -- SECTION 1 RESTRAINT OF TRADE ....................................................................... 19

VII.    PRAYER FOR RELIEF ..................................................................................... 19

VIII.    JURY TRIAL DEMAND ................................................................................... 21

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Plaintiffs Shaina Silverman and Tyler Kimbrough (the "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following Class Action Complaint (the "Action") against the above-captioned Defendants (collectively, the "Defendants"), upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel as follows:

## I. INTRODUCTION

1. Plaintiffs Silverman and Kimbrough bring this action on behalf of themselves and a class of all persons in the New York City-metro area (the "geographic market") who have leased multifamily residential real estate units (or, "rental units") directly from a Defendant or a co-conspirator from as early as November 18, 2018, through the present (the "Class Period").

2. A home – "*a place to rear ones' children and a place to rest ones' head*," as former New York Senator Robert Francis Kennedy once famously said – is one of the most important components of any person's life. The Defendants, who are titans of the multifamily rental industry throughout the entirety of the United States, are responsible for a conspiracy to harm hardworking New Yorkers in the New York City-metro area by colluding to artificially raise prices for multifamily rental units in the region, causing Plaintiffs and Class Members to pay supracompetitive prices for multifamily rental units during the Class Period.

3. Throughout the Class Period, prices for rental units in the New York City-metro area, which is already among the most expensive housing markets in the United States, have been artificially higher than they otherwise would have but for the Defendants' conspiracy to fix, stabilize, or increase prices artificially. The way that the conspiracy operates is as follows: Lessor Defendants, who are property managers, owners, and operators in the geographic area, like Defendant Greystar Real Estate Partners LLC ("Greystar"), subscribe to a software platform produced by Defendant RealPage, Inc. ("RealPage") called YieldStar. YieldStar, which is applied to tens of thousands of apartments in the geographic market, assesses hundreds of variables particular to each unit and proposed lease offered by the Lessor, like Defendant Greystar. Then YieldStar uses an algorithm to determine pricing for each unit – and said pricing is shared amongst the Lessor Defendants. YieldStar advertises itself as having the ability to "track your competition's

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

rent with precision."[1] YieldStar allows Lessors to effectively eliminate price competition in the relevant market. YieldStar producing pricing for each respective unit, and, more than 80% of the time, Lessors adopt that price – and that adoption rate is policed and enforced by RealPage amongst its clients, the Lessors. And, as YieldStar pushes prices higher, the participating Lessors reap supracompetitive profits.

4. RealPage's executive officers have made a slew of statements highlighting the effectiveness of the conspiracy; for example, in Nashville, Tennessee at a real estate tech conference in Summer of 2021, RealPage executives marveled at skyrocketing rents as a result of YieldStar's ability to push supracompetitive prices onto rentors, like Plaintiffs and Class Members, stating "[n]ever before have we seen these [rent increase] numbers" and another executive acquiescing that, with respect to the nationwide trend of rental prices increasing, "**I think [YieldStar] is driving [rent price increases], quite honestly**."[2]

5. Indeed, "by RealPage's own admission, its algorithm is helping drive rents higher, [stating] '[f]ind out how YieldStar can help you outperform the market 3% to 7%" and Defendant Greystar stated "its buildings using YieldStar 'outperformed their markets by 4.8%.'"[3] New York City apartments are already notoriously expensive, and for a conspiracy to push those prices even higher makes the cost-of-living even more burdensome and the ability to afford living in the geographic market even more difficult to be able to stomach. Indeed, median asking rental prices were remarkably consistent (other than during the beginning phases of COVID-19) and have significantly increased in the geographic area during the Class Period proposed by Plaintiffs:

---

[1] https://www.realpage.com/videos/revenue-management-software-oveview-sop/ (video) (last visited Nov. 15, 2022).

[2] https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent, (last accessed Nov. 15, 2022).

[3] *Id.*

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594



6.     The conspiracy Plaintiffs allege is unlawful under Section 1 of the Sherman Antitrust Act. Plaintiffs bring this action to recover damages, as well as trebled damages, and injunctive relief, on behalf of all others similarly situated.

## II.     JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

8.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22) and Federal Rule of Civil Procedure 4(h)(1)(A).

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

9. Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the sale of multifamily residential real estate leases.

10. Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of multifamily residential real estate leases.

11. Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

### III. PARTIES

**A. Plaintiffs Silverman and Kimbrough**

#### 1. Plaintiff Shaina Silverman

12. Plaintiff Shaina Silverman is a resident of the state of New York.

13. Plaintiff Silverman rented a multifamily rental unit from a Defendant Lessor during the Class Period. The unit rented by Plaintiff Silverman is in a building that is listed by RealPage as one of the buildings that it services. The unit rented by Plaintiff Silverman is located in the geographic area.

14. Plaintiff Silverman is a co-tenant with Plaintiff Kimbrough.

15. As a result of the Defendants' conduct complained of herein, Plaintiff believes she has suffered damages in the form of rent overcharges.

#### 2. Plaintiff Tyler Kimbrough

16. Plaintiff Tyler Kimbrough is a resident of the state of New York.

17. Plaintiff Kimbrough rented a multifamily rental unit from a Defendant Lessor during the Class Period. The unit rented by Plaintiff Kimbrough is in a building that is listed by RealPage as one of the buildings that it services. The unit rented by Plaintiff Kimbrough is located in the geographic area.

18. Plaintiff Kimbrough is a co-tenant with Plaintiff Silverman.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

19.     As a result of the Defendants' conduct complained of herein, Plaintiff believes she has suffered damages in the form of rent overcharges.

**B.     Defendant RealPage and the Lessor Defendants**

**1.     Defendant RealPage, Inc.**

20.     Defendant RealPage, Inc. is a Delaware corporation headquartered in Richardson, Texas. RealPage provides the YieldStar software and services which are at issue in this Action.

**2.     Defendant Brookfield Residential Properties LLC**

21.     Defendant Brookfield Residential Properties LLC is a Delaware limited liability company headquartered at Brookfield Place in New York, New York. Brookfield is one of RealPage's clients and rents and/or manages properties in the geographic area.

22.     Defendant Brookfield manages over 27,000 multifamily rental units throughout over 35 cities in the United States with an estimated 20,000 units under development. Defendant Brookfield manages at least 7 different properties in the geographic market.

**3.     Defendant Cushman & Wakefield, Inc.**

23.     Defendant Cushman & Wakefield, Inc. is a Delaware corporation headquartered in New York, New York. Cushman is one of RealPage's clients and rents and/or manages properties in the geographic area.

24.     Defendant Cushman manages at least 1 property in the geographic market.

**4.     Defendant Equity Residential**

25.     Defendant Equity Residential is a Maryland investment trust headquartered in Chicago, Illinois. Equity is one of RealPage's clients and rents and/or manages properties in the geographic area.

26.     Defendant Equity manages at least 1 property in the geographic market.

**5.     Defendant Greystar Real Estate Partners, LLC**

27.     Defendant Greystar Real Estate Partners, LLC is a Delaware limited liability corporation with its principal place of business in Charleston, South Carolina. Greystar is one of RealPage's clients and rents and/or manages properties in the geographic area.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

28.     Defendant Greystar is the largest multifamily rental unit manager in the United States. Defendant Greystar maintains, operate or owns approximately 47 different properties in the geographic market.

**6.      Defendant AvalonBay Communities, Inc.**

29.     Defendant AvalonBay Communities, Inc. is a Maryland corporation with its principal place of business in Timonium, Maryland. AvalonBay is one of RealPage's clients and rents and/or manages properties in the geographic area.

30.     Defendant AvalonBay Communities, Inc. is the third largest multifamily rental unit manager in the United States. Defendant AvalonBay Communities, Inc. maintains, owns, or operates at least 15 different properties in the geographic area.

**7.      Defendant TF Cornerstone, Inc.**

31.     Defendant TF Cornerstone, Inc. is a New York corporation with its principal place of business in New York, New York. TF Cornerstone, Inc. is one of RealPage's clients and rents and/or manages properties in the geographic area.

32.     Defendant TF Cornerstone, Inc. maintains, owns, or operates at least 20 different properties in the geographic area.

**8.      Defendant Rose Associates, Inc.**

33.     Defendant Rose Associates, Inc. ("Rose Associates") is a New York corporation with its principal place of business in New York, New York. Rose Associates is one of RealPage's clients and rents and/or manages properties in the geographic area.

34.     Defendant Rose Associates manages over 21,000 multifamily rental units throughout the geographic market, including for institutional property owners like Blackstone, the largest rental landlord in New York City. Additionally, Rose Associates openly admits to using RealPage AI Revenue Management Software at properties to "optimize pricing and reduce vacancies" beginning in January of 2022.[4] According to Scott Marino, executive director of

---

[4]  https://www.rosenyc.com/about-us/news-media/https-wwwprnewswirecom-news-releases-realpage-ai-revenue-management-software-allows-rose-associates-to-optimize-pricing-and-reduce-vacanci/, (last accessed Nov. 16, 2022).



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

multifamily rental units at Rose Associates, RealPage's revenue management solutions "inform[] our pricing and allows [Rose Associates] to reduce vacancies."[5]

### 9. Unnamed Co-conspirators

35. Unnamed coconspirators include all of the customers of Defendant RealPage who utilize the YieldStar and who rent multifamily rental units to consumers in the geographic area. Plaintiffs Silverman and Kimbrough reserve the right to amend their complaint to add additional Defendants as more information comes to light.

## IV. FACTUAL ALLEGATIONS

### A. The Relevant Market Responds to Supply and Demand Fundamentals in the Normal Course

36. The relevant product market is the market for the lease of multifamily residential real estate and the relevant geographic market is in and around New York City. Specifically, this includes Manhattan, Queens, Brooklyn, the Bronx, Staten Island, and the immediate surrounding area (for example, Hoboken, New Jersey).

37. Multifamily real estate leases in the New York City metropolitan area comprise a distinct product market and geographic area. Residents of this geographic area come to this area to move to the greatest center of urban life, New York City. New York City's relevant market for multifamily residential real estate, therefore, is not realistically competing with other municipalities because each municipality is distinct and has a number of factors which affect the price of living in that respective place.

38. Consumers do not consider apartments, condominiums, or houses for purchase as substitutes for multifamily rental apartment units because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing. Nor is single-family real estate considered an economic substitute for multifamily residential real estate. For example, single-family properties typically do not offer amenities and security.

---

[5] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

39.     The New York multifamily rental market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

40.     Here, the SSNIP test is satisfied and the market is properly defined. As described above and below, pursuant to the Lessors' agreement not to compete on price, Lessors are able to increase "year over year, between 5% and 12% in every market," including New York, yet those increases have not driven enough renters out of the New York rental market such that the SSNIP has become unprofitable to Lessors.

## B.     Defendant's Businesses

41.     The Lessor Defendants rent multifamily rental units to consumers throughout the geographic area. Defendant RealPage provides software and other real estate services to the Lessor Defendants and unnamed coconspirators. Specifically, in the geographic area, Defendant RealPage provides services to the following buildings:



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594



42.    Across the entirety of the United States, RealPage clients manage over 19 million of the United States' total 48.5 million rental units.

43.    These buildings contain multiple units – some of them contain hundreds of units, if not more. Many of these buildings are managed and/or owned by the Lessor Defendants listed in this Action – including the building where Plaintiffs Silverman and Kimbrough lived at the time that this Action was initially filed.

44.    Defendant AvalonBay, for example, operates over a dozen buildings which each contain dozens of units – if not hundreds of units per building. These buildings include, but are not limited to: Ava DoBro; Avalon at Edgewater; Avalon Bowery Place I; Avalon Bowery Place II; Avalon Clinton; Avalon Midtown West; Avalon Morningside Park; Avalon North Bergen; Avalon Riverview North; Avalon Riverview South; Avalon West Chelsea; Avalon Willoughby Square; AVA Fort Greene; and, AVA High Line. Each of these buildings use the algorithm provided by YieldStar in order to price their units to consumers.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

45.     The same is similarly true with Defendants Brookfield, Rose Associates, Greystar and TF Cornerstone, who collectively manage, own or operate dozens of buildings in the geographic area, and who also use the same YieldStar software for the purposes as described in this Action.

**C.     Before RealPage, Lessors Set Prices Independently**

46.     Before RealPage facilitated collusion among Lessors, Lessors acting independently tried to maximize occupancy. Every day a unit was left empty was a lost opportunity to earn revenue for that day, so Lessors offered sufficiently attractive pricing to maintain maximum occupancy. This often came in the form of reduced prices or promotional offers, such as rental concessions (offering the first month free if the customers signed a one-year lease).

47.     Lessors maximized occupancy by setting their own prices based on their independent observations of the market. This type of pricing strategy is characteristic of a competitive market.

48.     This competitive market was to the advantage of consumers, as competition generally fosters lower prices; here, Defendant Lessors, in a competitive market, would offer lower prices in order to compete to fill vacancies with other Defendant Lessors in the same geographic area.

**D.     The Lessor Defendants Eliminate Competition by Outsourcing Price and Supply Decisions to a Common Decisionmaker, RealPage**

49.     Instead of offering concessions and discounts to entice customers as Lessors did in the normal course, RealPage enabled Lessors to set and keep rents artificially high and defy fundamental supply and demand dynamics. Following widespread adoption of RealPage's YieldStar software, Lessors swiftly shifted from the previous competitive status quo to a new strategy, facilitated by RealPage: increasing prices notwithstanding market conditions and tolerating the lost revenue resulting from any unrented and empty housing units. In a competitive market, this strategy would quickly fail—any units listed at prices exceeding the market price would be undercut by competitors and thus stay empty, and that respective lessor would eventually go out of business.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

50.     RealPage and participating Lessors have effectuated their anticompetitive agreement to hike prices by agreeing generally to set prices using RealPage's coordinated algorithmic pricing. Participating Lessors also agreed to provide RealPage with real-time access to their competitively sensitive and nonpublic data on their housing real estate leases. In the market RealPage and Lessors created, each Lessor had mutual assurances that other Lessors would also keep prices high, leaving renters with no choice but to pay what Lessors demanded. RealPage helped lessors overcome their "lack of faith in the property's ability to command the rental rates generated."

51.     RealPage's system and YieldStar algorithm granted Lessors pricing courage, or pricing discipline. This is reflected in RealPage's own marketing materials. Andrew Bowen, RealPage's Vice President of Investor Markets, said the algorithm is "driving" the growth, because "[a]s a property manager, very few of us would be willing to actually raise rents double digits within a single month by doing it manually." During an earnings call in 2017, founder and former CEO Steve Winn said one large property company, which managed more than 40,000 units, learned it could make more profit by operating at a lower occupancy level that "would have made management uncomfortable before." More bluntly, the creator of RealPage's revenue management software Jeffrey Roper stated that the software circumvented agents who had "way too much empathy" and hesitated to push rents higher.

52.     Customer testimonials on RealPage's website tout their newfound pricing courage. "The beauty of YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it," said Kortney Balas, director of revenue management at JVM Realty. America Melragon, VP of Revenue Management for IRT, stated in a video testimonial: "We've actually noticed that already that in the majority of our markets … competitors that do not use a sophisticated revenue management tool, competitors that are manually pricing have already started to experience pretty significant swings in their effective price, pretty significant swings in their overall concessions. For us, really having that insight into our own individual supply and demand exposure has helped our price pretty much stay in line with where we anticipate it to be."

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

53.     On information and belief, RealPage regularly provides participating Lessors with recommended price levels through their revenue management algorithms, which Lessors accept more than 80% of the time – this is due in part to a classic prisoner's dilemma. RealPage recommends (and Landlords have followed the principle) that price maximization is possible only if all participants adhere to the pricing matrix provided by RealPage's software.

54.     Additionally, RealPage regularly meets and communicates with Lessors regarding their pricing strategies.

55.     RealPage strongly emphasizes the importance of participating Lessors to focus on maximizing profitability and total revenue, rather than the procompetitive focus on occupancy rates that would occur in a competitive market and did occur among lessors before the rise of revenue management programs. Jeffrey Roper, RealPage's main architect, publicly described the problem: "If you have idiots undervaluing, it costs the whole system."

## E.     The Lessor Defendants Have Inflated Prices, Reduced Occupancy (i.e. Output) and Have Distorted the Market for Residential Real Estate Leases

56.     Trusting that their co-conspirators would not undercut them, Lessors kept rents high and tolerated the lost revenue resulting from any unrented and empty housing units—and rents were raised so high that revenues dwarfed any losses from unrented units. RealPage has recommended that Lessors accept a lower occupancy rate in order to raise rents and ultimately make more money. Founder and former CEO Steve Winn stated that one lessor had been seeking occupancy levels of 97% or 98% in markets where it was a leader, but upon implementing YieldStar, managers saw that raising rents and leaving some apartments vacant made more money. Winn stated, "Initially, it was very hard for executives to accept that they could operate at 94% or 96% and achieve a higher NOI by increasing rents," but RealPage permitted them to "operate at 95%, while seeing revenue increases of 3% to 4%."

HB    HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

57. According to the RealPage Market Leaderboard, the New York City-metro area/geographic area "was an outperformer in terms of overall occupancy and rent growth in October [2022]. The market recorded occupancy of 97.87% …"[6]

**F. Plus Factors Indicate the Market for Multifamily Residential Real Estate Leases in the Geographic Areas is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel**

58. The New York City-metro area multifamily market for the sale of multifamily residential real estate leases from Lessors to lessees is characterized by numerous "plus factors" that render the industry susceptible to collusion such that the formation, maintenance, and efficacy of a cartel is more likely. These include (1) high barriers to entry, (2) high barriers to exit, (3) market concentration, (4) inelastic consumer demand, (5) relative fungibility of residential real estate leases, (6) exchanges of competitively sensitive information among horizontal competitors, and (7) numerous opportunities to collude at trade associations and RealPage functions.

59. First, property owners and operators face significant entry barriers. These include the high cost of acquiring property, establishing a property management infrastructure, and ongoing costs of building maintenance and regulatory compliance. Even small rental properties cost millions of dollars to acquire. Large properties, such as those operated by Greystar, run into the hundreds of millions of dollars to own and manage, and take several years and significant experience to build or acquire. Thus, new entrants into the multifamily real estate leasing market are unlikely to discipline cartel pricing.

60. Second, renters face high exit barriers. Renters typically incur substantial costs and inconvenience when moving. As such, renters cannot easily turn to alternative lessors to discipline cartel pricing.

61. Third, the demand for multifamily housing real estate property leases is relatively inelastic. Except for an anomalous period during the height of the COVID-19 pandemic, renters needed to live near their offices, schools, and communities. For a New York City-area resident,

---

[6] https://www.realpage.com/explore/main/ny/new-york-white-plains, (last accessed Nov. 15, 2022).

CLASS ACTION COMPLAINT - 13
Case No.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

there were few realistic and low-cost alternatives to renting from a Lessor Defendant, who dominated the relevant market during the class period. Thus, no reasonable substitutes exist to discipline cartel pricing.

62. Fourth, the New York multifamily submarket is highly concentrated. For example, Defendant Rose Associates, Inc. manages over 21,000 multifamily rental units in the geographic area for multiple property owners, including the geographic area's largest residential landlord, Blackstone.

63. James Nelson, a former bank examiner and loan broker, is writing a book on the topic of national concentration of landlords, telling ProPublica, "There is no competition." This reflects a national trend: the number of apartments controlled by the country's 50 largest property managers has grown every year for 14 years, according to the National Multifamily Housing Council.

64. Fifth, multifamily housing residential real estate properties are relatively fungible, particularly within classes of properties. That is, when controlling for certain high-level characteristics of properties—such as the number of bedrooms and bathrooms, amenities, location, or the age of the building—properties within those classes are relatively fungible.

65. Sixth, RealPage's participating Lessors, directly and using RealPage as a conduit, share competitively sensitive information with one another. Founder and former CEO Steve Winn has noted in earnings calls that RealPage's numbers "give a much more accurate view of what's happening in the market compared to merely looking at rents reported by Internet listing services or other sources." It is even less likely that this function could be recreated using any public, non-competitively sensitive sources as the advertised rates for multifamily real estate leases can diverge from the actual rates. Furthermore, RealPage provides specific, non-public pricing information on important factors such as concessions that are given at the time of lease that are individually negotiated and not otherwise publicly available.

66. Seventh, RealPage and participating Lessors have ample opportunities to collude.

67. RealPage operates a private RealPage User Group Forum, an association of over a thousand participating Lessors, which, according to RealPage, aims "to improve communications

CLASS ACTION COMPLAINT - 14
Case No.:

Case 3:23-cv-00335    Document 1    Filed 12/08/22    Page 17 of 24    Page ID #:17

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

between RealPage and the user community," while "promot[ing] communication between users" themselves. Within that Forum is an "Idea Exchange," where Lessors submit their own recommendations for changes or improvements to RealPage's offerings, as well as provide comments on proposed changes that RealPage is considering implementing to its software offerings.

68. RealPage also encourages clients to serve on subcommittees, which requires that client "[a]ttend one annual meeting to be held during the RealWorld conference" and "[p]articipate in one conference call per quarter."

69. RealPage has hosted in-person, annual, multi-day RealWorld summits. The summits gather Lessors with RealPage executives to network, exchange insights and ideas, and discuss revenue management tools. Over the past five years, those conferences have been held in Las Vegas, NV, Nashville, TN, Orlando, FL, and virtually during the COVID-19 pandemic.

70. Industry trade associations offer RealPage and participating Lessors additional opportunities to conspire. As an illustrative example, the National Multifamily Housing Council ("NMHC"), which advertises itself as "the place where the leaders of the apartment industry come together to guide their future success," holds several events every year, including in person "Apartment Strategy Conference," an "Annual Meeting," a "Fall Meeting," hosted in cities including San Diego, CA, Las Vegas, NV, and Washington, DC. NMHC counts among its "Chair's Circle Sponsors" RealPage, Greystar, and more participating Lessors. Of note, NMHC "tracks market conditions through NMHC member surveys as well as data from data provider partners," to provide "industry benchmarks" on topics including "In Place Rent Per Square Foot," "Rent Change – New Leases," and "Rent Change – Renewals." RealPage has also attended Pension and Real Estate Association, Urban Land Institute, and National Apartment Association ("NAA") conferences.

71. Finally, RealPage advisors have regular contact with Lessors to keep them up to date on their competitors. Advisors help Lessors "Review pricing daily or weekly in collaboration with on-site and regional operations management," "Monitor and report on weekly rents, occupancy and revenue trends," and "Adjust configurations and pricing to align with your asset

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

objectives as market conditions and business strategies change." In an earnings call, CFO Tom Ernst stated that they were "actively ramping" efforts to have RealPage's sales team discuss their revenue management products with their clients.

**G.      Defendants Violate FTC Guidelines**

72.     The FTC's 2014 Guidance on Information Exchanges (the "Guidance") states: "[e]ach day companies seek out market information to gain insights on how to compete more effectively. When companies compete more effectively, that can be good for consumers, making more and better goods and services available to the at lower prices."

73.     The Guidance continues: "[b]ut when competing companies seek market intelligence by exchanging price information or other commercially sensitive information, they may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."

74.     The FTC warns that "the sharing of information among competitors results in an agreement to fix prices or limit output, that agreement may be unlawful *per se*, and could lead to criminal charges."

75.     The same can be said about the Defendants' conduct here: an exchange (YieldStar) of sensitive price and supply data input by the Lessor Defendants which is updated in real time and is easily discernable by competitors who use YieldStar. This data exchange allows the Lessor Defendants to eliminate competition between each other, leading to higher prices for Plaintiffs and the Class Members.

76.     While the FTC also states that a safety zone in which reasonable data exchanges are acceptable exists, that safety zone provides no safe harbor for the Defendants here.

**H.      Defendants' Conduct Has Drawn Scrutiny**

77.     On November 14, 2022, 17 Members of the United States House of Representatives signed and sent a letter to the Department of Justice's Antitrust Division and the Federal Trade Commission calling for investigation(s) of RealPage's rent-setting software.

78.     In that letter, the Members of the House of Representatives stated that Defendants could be *per se* in violation of antitrust laws, also stating "[t]he Federal Trade Commission and

CLASS ACTION COMPLAINT - 16
Case No.:

Case 3:23-cv-00335    Document 1    Filed 12/08/22    Page 16 of 24    PageID 19

HB    HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

the Department of Justice have a responsibility to ensure anticompetitive practices are not contributing to already exorbitant rent costs for everyday people, and we respectfully ask that you open an investigation into RealPage."

## I. Defendants' Conduct Has Caused Antitrust Injuries

79. Defendants' anticompetitive conduct had the following effects, among others:

    a. Competition among Defendants and Unnamed Co-conspirators has been restrained or eliminated with respect to residential rental units;

    b. The price of residential rental units has been fixed, stabilized, or maintained at artificially high levels; and,

    c. Individuals have been deprived of a free, competitive, and open market.

80. Defendants' violations of antitrust laws have caused the Plaintiffs and Class Members to pay higher prices for residential rental units than they otherwise would have absent the illegal contract, combination or conspiracy, and, as a result, have suffered damages in the form of overcharges paid on their rental units.

81. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## V. CLASS ALLEGATIONS

82. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> All persons in the New York City metro area that are direct purchasers of multifamily residential real estate leases from a Lessor participating in RealPage's pricing software, or from a division, subsidiary, predecessor, agent, or affiliate of such Lessor, at any time during the period of November 18, 2018, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

83. The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands if not hundreds of thousands of members in the proposed Class.

84. Plaintiffs' claims are typical of those of the Class.

CLASS ACTION COMPLAINT - 17
Case No.:

Case 3:23-cv-00335    Document 1    Filed 12/08/22    Page 20 of 24

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

85. Plaintiffs and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for multifamily residential leases than they otherwise would have in a competitive market.

86. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are not antagonistic to the Class.

87. Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members, since the Defendants have acted and refused to act on grounds generally applicable to the Class.

88. Questions of law and fact common to the Class include:

    a. Whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate price and/or artificially suppress supply of multifamily residential real estate leases from competitive levels;

    b. If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the *per se*, quick look, or rule of reason modes of analysis;

    c. If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply of multifamily residential real estate leases from competitive levels;

    d. The proper measure of damages; and

    e. The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

89. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

90. Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ACT -- SECTION 1
### RESTRAINT OF TRADE

#### (On behalf of the class for injunctive and equitable relief and damages)

91.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

92.     Beginning at a time currently unknown to Plaintiffs and members of the Class, Defendants and their co-conspirators formed a cartel to artificially inflate the price of and artificially decrease the supply and output of housing leases in the New York multifamily market.

93.     Defendants' cartel has caused Plaintiffs and members of the Class to suffer overcharge damages.

94.     There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

95.     The Defendants' cartel is unlawful under a *per se* mode of analysis.

96.     In the alternative, the Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

A. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

C. Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act; on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

F. Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1     G.     Plaintiffs and the members of the Class recover their costs of suit, including

2           reasonable attorneys' fees, as provided by law; and

3     H.     Plaintiffs and the members of the Class have such other and further relief, including

4           injunctive relief, as the case may require and the Court may deem just and proper.

## VIII.   JURY TRIAL DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: December 8, 2022          Respectfully submitted,

                              By: */s/ Steve W. Berman*
                                Steve W. Berman, WSBA #12536
                            By: */s/ Breanna Van Engelen*
                                Breanna Van Engelen, WSBA #49213
                            HAGENS BERMAN SOBOL SHAPIRO LLP
                            1301 Second Avenue, Suite 2000
                            Seattle, Washington 98101
                            Telephone: (206) 623-7292
                            Facsimile:  (206) 623-0592
                            steve@hbsslaw.com
                            breannav@hbsslaw.com

                            *Local Counsel for Plaintiffs*

                            Israel David*
                            Blake Hunter Yagman*
                            ISRAEL DAVID LLC
                            17 State Street, Suite 4010
                            New York, New York 10004
                            Telephone: (212) 739-0622
                            Facsimile:  (212) 739-0628
                            israel@israeldavidllc.com
                            blake.yagman@davidllc.com

                            *Attorneys for Plaintiffs*

                            *\*Pro Hac Vice Application Forthcoming*

